AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); AND 40 U.S.C. § 5104 (e)(2) | ) ) ) ) ) Case No.  21-SC-2404 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

Located in the _____Northern District of California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder; 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress; 18 U.S.C. § 1752(a)(1) and (2) - Entering and Remaining and Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2) - Violent Entry and Disorderly Conduct on Capitol Grounds. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Corey Snitchler, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone_____ *(specify reliable electronic means).*

Date:  _____7/26/2021_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-SC-2404 |
| INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT | ) | |
| PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. | ) | |
| 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 231(a)(3); 18 | ) | |
| U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); AND 40 U.S.C. § 5104 | ) | |
| (e)(2) | | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

  An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the    Northern District of California   .
*(identify the person or describe the property to be searched and give its location)*:

 See Attachment  A (incorporated by reference).

  I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

 See Attachment  B (incorporated by reference).

  **YOU ARE COMMANDED** to execute this warrant on or before   August 9, 2021   *(not to exceed 14 days)*
 ☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

  Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

  The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   G. Michael Harvey  .
                           *(United States Magistrate Judge)*

  ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
 ☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of      .

Date and time issued:   7/26/2021               
                          *Judge's signature*

City and state:   Washington, D.C.         G. Michael Harvey
                          United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-2404 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the **Google LLC**. account identified by timhart@gmail.com and **YouTube** account identified by youtube.com/c/i70show, User ID 100370637268291474774, which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Google LLC (the "Provider") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. All records or other information regarding the identification of the Account(s), to include full name, physical address, telephone numbers, username and other identifiers, primary e-mail address, any secondary or alternative e-mail addresses (including both current and historical accounts), records of session times and durations, Activity and Device Logs, the date on which the Account(s) was created, the length of service, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, cookies, connected applications and sites, methods of connecting, log files, and means and source of payment (including any credit or bank account number), and other subscriber numbers or identities (including the registration IP address), including any current or past account(s) linked to the Account by telephone number, recovery or alternate e-mail address, IP address, cookie, or other unique device or user identifier;

b. All records or other information regarding the devices associated with, or used in connection with, the Account(s), (including all current and past trusted or authorized Android devices and computers, and any devices used to access Google services associated with the Account(s)), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI") or other device identifier, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

**c.**   Passwords or other protective devices in place and associated with the Accounts, which would permit access to the content stored therein;

**d.**   The types of applications and services utilized by the Account(s);

**e.**   All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to PROVIDER;

**f.**   For the period from January 01, 2021 to present, all contacts stored by the Account(s), including address books, phone numbers, e-mails, social network links, calendar data, and images;

**g.**   For the period of January 04, 2021 to January 08, 2021 all location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, Wi-Fi locations, IP addresses, search history, advertising data, or metadata of images and videos, including all data associated with the use of Location Services and Location History, and all Google Maps data (including data concerning route searches, saved, starred, and/or favorite locations, frequent locations, and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above), and SSIDs and MAC addresses for all WiFi access points that have been detected by or connected to devices associated with the account.  Such data shall include the GPS coordinates and the dates and times of all location recordings;

**h.**   For the time period January 04, 2021 to January 08, 2021 all records concerning the deletion of location data associated with the Account (except for data deleted by PROVIDER in the normal course of business);

**i.**   For the time period January 01, 2021 to present, Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Maze services, locations and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above;

**j.**   For the period January 01, 2021 to present all incoming and outgoing phone calls, voice-mails, and all instant messages associated with the Account(s) including stored or preserved copies of instant messages (including SMS messages and MMS messages) sent to and from the Account(s) (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message,

the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

**k.** For the period January 01, 2021 to present, all activity relating to chats, such as **Google Hangouts**, including, but not limited to: all communications, including audio, video, text message and/or chat communications, and all data associated therewith;

**l.** For the period January 01, 2021 to present, the contents of all **e-mails** associated with the Account(s), including stored or preserved copies of e-mails sent to and from the account (including all draft e-mails and deleted e-mails), the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, the size and length of each e-mail, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the e-mails, and all attachments;

**m.** For the period January 01, 2021 to present, the contents of all files and other records stored on **Google Drive**, including, but not limited to: all device backups, all Google or third-party app data, and all files and other records, address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voice-mails, device settings, and bookmarks;

**n.** For the period January 01, 2021 to present, all records and other information concerning any apps or files downloaded, installed, uninstalled, or modified from the **Google Play Store**;

**o.** For the period January 01, 2021 to present, all files, posts, comments, and replies uploaded to YouTube by the account;

**p.** For the period January 01, 2021 to present, all information for the **Google Plus** profile associated with the Account(s), including all status updates, tag-lines, profile photos, background photos, cover photos and other information regarding the user of the profile, comments, items shared by or with the profile, links to videos, photographs, articles, and other items, contact or "circle" lists created by the profile, contact or "circle" lists or other groups and networks of which the profile is a member, profiles or other items "followed" by the user of the profile, Google Plus users that "followed" the profile, and information about access and use of Google Plus;

**q.** For the period January 01, 2021 to present, all call detail records, connection records, SMS, MMS, voice-mail messages sent by or from the **Google Voice** or **Allo** account associated with the Account(s);

**r.** For the period January 01, 2021 to present, all **Web** activity, including records of Internet browsing history from mobile searches, desktop browser searches, and searches of the Android device;

**s.** For the period January 01, 2021 to present, recent application usage associated with the Account(s) or its users (such as information collected through tracking cookies)

**t.** For the January 01, 2021 to present, all activity relating to **Google Photos**, including, but not limited to: all images, graphic files, video files, and other media files stored in the Account(s), and/or were uploaded to or downloaded from any other Google service, and all data associated therewith, including the metadata for each file;

**u.** For the period January 01, 2021 to present, all records pertaining to communications between PROVIDER and any person regarding the Account(s), including contacts with support services and records of actions taken.

**v.** The Provider shall deliver the information set forth above via Google's electronic portal.

The Provider is hereby ordered to disclose the above information to the government within **10 days** of service of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of Title 18 United States Code Section 231(a)(3) (Civil Disorder); Title 18 United States Code Section 1512(c)(2) (obstruction/impeding official proceeding); Title 18 United States Code Section 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 United States Code Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by Timothy Hart ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information, records, communication, images, videos and material related to the Subject Offenses, including evidence of criminal activity, association with other persons who were involved in the Subject Offenses, transportation and travel to and from Washington, D.C. on January 06, 2021, or disruption of the 2020 election results or the Congressional function.

(f) Internet search history related to travel to Washington, D.C., activities on January 06, 2021, or the Subject Offenses;

(g) Information, that constitutes evidence of any persons entry on to U.S. Capitol Grounds, including into the U.S. Capitol on January 06, 2021, including, but not limited to, planning in advance of said entry, communications relating to said entry, any coordination with others regarding said entry, actions taken while inside the U.S. Capitol on January 06, 2021, coordination with others regarding actions taken while inside of the U.S. Capitol on January 06, 2021, and any communications after said entry about said entry or activities within;

(h) Viewing history of the user's account as it relates to content containing images related to the Subject Offenses;

(i) Location and GPS information relating to the location of the user of the account from January 05, 2021 to January 07, 2021; and

(j) Images, videos, communications, and material, whether encrypted or otherwise, relating to activities in Washington, D.C. on January 06, 2021.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); AND 40 U.S.C. § 5104(e)(2)** | **SC No. 21-SC-2404**<br><br>**<u>Filed Under Seal</u>** |

*Reference: Timothy Allen Hart      USAO Ref. # 2021R02223;*
*Subject Account(s):* timhart@gmail.com, youtube.com/c/i70show

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Corey Snitchler, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with two account[s]—that is, timhart@gmail.com, and youtube.com/c/i70show—which is stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 1600 Amphitheatre Parkway, Mountain View, California: and which maintains offices in the District of Columbia at 25 Massachusetts Avenue, NW, Washington, DC 20001.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in

1

Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI), Cincinnati Division.  I have been in this position since December 2020.  I have received training in national security investigations and criminal investigations.   I have conducted investigations related to domestic terrorism.   As part of these investigations, I have participated in records analysis, conducted interviews, and served subpoenas.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 United States Code Section 231(a)(3) (Civil Disorder); Title 18 United States Code Section 1512(c)(2) (obstruction/impeding official proceeding); Title 18 United States Code Section 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 United States Code Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") which have been committed by Timothy Hart.  There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

2

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

6.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only

3

authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").   The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).   Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.      As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.      At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP who were there to protect the U.S. Capitol.

13.      At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.   Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

4

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the Certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted in those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're going to fucking take this," which law enforcement believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers, forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also

confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.



22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     A subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming report, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screenings or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. EST, after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m., the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

## Cell Phone Usage at the Riot

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

11

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

12





[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



*Tips Providing Investigative Leads Regarding Timothy Hart's*
*Possible Involvement in Events of January 6, 2021*

37.     Throughout March of 2021, the FBI received multiple tips from at least four individuals regarding the person that the FBI has subsequently identified as Timothy HART.  The tips included a possible subject name, a possible business associated with the subject, information regarding the subject living in Dayton, Ohio, identification of social media accounts associated with the subject, and a description of the clothing the subject wore on January 6, 2021.  Based upon information and belief, the four witnesses who provided these investigative leads in March 2021 did not personally know HART.

38.     One of the tipsters reported that HART filmed himself driving to Washington D.C., filmed the riots that took place, and posted videos on a YouTube channel using the account of "i70_".  That tipster submitted the following images, labeled Image 1 and Image 2 respectively:

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

 

39.     Another one of the tipsters advised that HART posted a video of himself driving

from Ohio to Washington D.C. on YouTube at https://youtu.be/WDAsgTjQgEM.


*Further Investigation Confirming Identification of Hart*

40.     Based on the tips that had been provided above, law enforcement took additional

steps to identify HART.  On May 24, 2021, the FBI interviewed an individual ("Witness 1") who

knows HART and is familiar with HART's appearance.  Witness 1 was shown Images 3 and 4 by

law enforcement and Witness-1 identified Timothy HART in those images.  Images 3 and 4 are

provided below:



41.     Your affiant reviewed Timothy HART's Bureau of Motor Vehicle records, including his driver's license photo, and compared the driver's license photo with Images 1 and 2 provided by one of the tipsters.  The appearance of the individual in the above Image 1 is consistent with the appearance of Timothy HART based on comparisons of the image to his Bureau of Motor Vehicles driver's license photo.

42.     Law enforcement has searched for additional information regarding the business associated with HART that was referenced by three of the tipsters.  Records on the Ohio Secretary of State website reflect the following information: I70 PAINTBALL & AIRSOFT, LLC, Timothy Hart, 7750 Wildcat Road, Huber Heights, OH, 45424.

43.     Through open source research, law enforcement located the YouTube account with the handle "i70_" (an apparent reference to HART's business).  The YouTube account includes five videos posted between January 4 and January 6, 2021.  The relevant videos can be summarized as follows: 1)  a video of the Trump rally on January 6, 2021; 2) a video taken while walking to the Capitol; 3) a video that appears to be recorded from the top of a scaffolding showing the protestors pushing past Capitol Police on January 6; 4) a second video that appears to be recorded

from the top of scaffolding showing the protestors pushing past Capitol Police on January 6; and

5) a video of HART captioned as "Headed to DC from Dayton Ohio to support President Trump

because the election was tainted" recording himself driving to Washington D.C. in which he says

he is going "to represent for Donald J. Trump."

44.     Records from Google for the YouTube channel i70 reflect a subscriber date of birth

that is HART's date of birth, and the associated Google Pay information is Timothy HART at 7750

Wildcat Rd, Huber Heights, OH with a phone number ending in -2185.[4]

45.     During the course of the investigation, law enforcement has identified additional

images that appear to show HART on Capitol grounds and inside the Capitol Building (in the same

clothing described above).  An example is below, Image 5.



46.     Additionally, a publicly available YouTube video posted by Buggs Media Network

on January 11, 2021, appears to capture HART, along with many other individuals, engaging in

disruptive or disorderly conduct by knocking down well-marked barriers manned by uniformed

officers.  The crowd, including HART, were able to overwhelm the officers and move toward the

---

[4] The full number was provided in the Google records; however, only the last four digits are included here due to the public nature of the filing.

Capitol where the Electoral Vote would be counted. HART and others also entered restricted Capitol grounds. This activity took place at approximately 12:45 p.m. on January 6, 2021, as preparations for the proceedings described above were underway in the House and Senate, a large crowd gathered to the West of the U.S. Capitol around the Peace Monument, located in the Pennsylvania Avenue, NW, and 1st Street, NW, roundabout, that was commonly referred to as "Peace Circle" by U.S. Capitol Police Officers. The crowd then moved southeast to the threshold of the sidewalk that connects Peace Circle to the U.S. Capitol Building, commonly referred to as the "Pennsylvania Ave Walkway" by U.S. Capitol Police Officers. Metal barricades had been put in place by U.S. Capitol Police Officers. The metal barricades were intended to keep the public away from the Capitol building and the Congressional proceedings underway inside.

47.     In the YouTube video posted by Buggs Media Network, it shows that the area was blocked off by a line of barricades that were manned by U.S. Capitol Police Officers. The U.S. Capitol Police Officers were wearing Capitol Police Uniforms bearing police insignia and were standing in the restricted area to protect it. The barricades were constructed of metal bike rack barriers, physically linked end to end, and reinforced with dark colored plastic mesh safety fencing affixed behind the metal bike racks. The fence line was clearly marked with large white "AREA CLOSED" signs affixed to the fencing with bold red lettering (screenshot showing HART and "AREA CLOSED" sign circled in red below in Image 6).



48.     The individual was wearing a red hood with a black hat and sweatshirt with a "Q" on it, similar to other images taken of HART.  Screenshots from the video are below, Image 7 and Image 8 (HART circled in red):

49.     Legally obtained subscriber information for a phone number ending in -2185—the same one linked to the Google Pay account referenced above—is subscribed to Stephanie Hart at 7750 Wildcat Rd, Huber Heights, OH.  Stephanie Hart is believed to be Timothy HART's wife. Payment information for the telephone account showed that the past approximately five payments had been made by Timothy HART.




19

50.    The video shows HART pushing the barricade and eventually going around it towards the Capitol.   Below are a series of screenshots, Images 9, 10, and 11—showing the progression of HART helping to push the barricades until the crowd successfully pushed the barricades against the officers.





51.     Another    publicly    available    video    posted    on    Twitter,    available    at
https://d2hxwnssq7ss7g.cloudfront.net/aRWTR7sk7i90_cvt.mp4, shows a large crowd walking

towards the Capitol.   The video shows HART in the crowd.  Eventually, he walks up onto stairs,

as seen in the screenshots below, Images 12 and 13:



52.     In the video, the crowd chants and HART appears to be recording the events from his mobile device, while using a selfie stick.  He also appears to be wearing a bright orange speaker around his neck.  Eventually while a person standing in front of HART is yelling "WE ALREADY VOTED AND WHAT HAVE THEY DONE?  THEY STOLE IT!  WE WANT OUR FU**ING COUNTRY BACK.  LET'S TAKE IT!"  The man standing in front of HART goes on to yell "COME ON!" and "LET'S GO!" multiple times.  While the person is yelling in front of him, HART begins to start gesturing towards the crowd as if he is encouraging them to come towards the Capitol by waving his arms.  HART's arm gestures can be seen in the below screenshots from the video, Images 14, 15, and 16.



53.     HART eventually made his way into the Capitol.  An Instagram video posted on an account called "brotunda" on or about January 6, 2021, appeared to show HART smoking in the U.S. Capitol Rotunda.  It can be inferred that HART was smoking marijuana in the video due to the fact that the individual who was taking the video was counting how many "joints" were in the video and asked another individual if he smoked weed.  Based on my training experience, I know that marijuana is commonly referred to as weed and marijuana cigarettes are commonly referred to as joints.  Marijuana is a Schedule I controlled substance.  Smoking of any kind is prohibited in the U.S. Capitol.  A screenshot from the Instagram post is below, Image 17.



54.     Legally obtained subscriber information for a phone number ending in -2185—the same phone number linked to the Google Pay account referenced above—is subscribed to Stephanie Hart at an address in Huber Heights, OH.  Stephanie Hart is believed to be Timothy HART's wife.  Payment information for the telephone account showed that the past approximately five payments had been made by Timothy HART.  Pursuant to legal process, law enforcement has also learned that the person carrying the phone ending in -2185 was found to be in the area of the U.S. Capitol Building at a time between 13:00 and 18:30 on January 6, 2021.

55.     On March 19, 2021, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the Google LLC account timhart@gmail.com and YouTube account youtube.com/c/i70show.

56.     Your affiant is aware that when a user of social media such as YouTube, such as Hart, accesses or uses their social media accounts using a mobile device, that the PROVIDER obtains and retains information and data from the user in related Google services, such as in the GPS location and communications/comments on the YouTube channel.  Your affiant is also aware that email accounts associated with a YouTube account will often receive updates and information

24

from the user's YouTube channel, including comments, like and links associated with their content.

## BACKGROUND CONCERNING GOOGLE

57.     PROVIDER is the provider of the internet-based account(s) identified in Attachment A.

58.     PROVIDER is considered an electronic communications service ("ECS") and a remote computing service ("RCS") provider because it provides its users access to a variety of electronic communications and remote computing services as defined by 18 U.S.C. §§ 2510(15) and 2711(2).  PROVIDER provides a diverse array of Internet-based services designed to facilitate communication, information sharing, and cloud storage for its users.  User-based services range from e-mail (Gmail), to online collaboration platforms (such as Google Docs, Google Sheets, Google Forms, and Google Jamboard), to cloud storage (Google Drive). [5]

59.     Based on my training and experience, I know that PROVIDER allows users to obtain accounts by registering with PROVIDER.  During the registration process, PROVIDER asks users to create a username and password, and to provide basic personal information, such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases, a means of payment.  PROVIDER typically does not verify user names.  However, PROVIDER does verify the e-mail address or phone number provided.

60.     Among its services, PROVIDER provides e-mail services through Gmail, which includes folders, such as an "inbox" and a "sent mail" folder, as well as electronic address books

---

[5] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

or contact lists, and all of those folders are linked to the user's username.  Moreover, a user's PROVIDER e-mail account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; document creation, sharing and storage; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the user.  Such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the user, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER user can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I understand that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER user.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

61.     PROVIDER also offers access to the website YouTube.  YouTube is a video-sharing website that allows people to discover, watch and share videos. It also acts as a distribution platform for original content creators and advertisers large and small.  Users who have a YouTube account can also comment and communicate on the platform with other YouTube users.

62.     PROVIDER also offers users access to a free voice-over-internet-protocol (VOIP) communications system called Google Voice.  Users are provided with a phone number they select from a pool of available numbers.  These numbers can be from whatever area code and

26

prefix they desire and have no correlation with the user's actual location when the number is selected. Users can make and receive phone calls and text messages through the Google Voice platform on their device or through a browser. PROVIDER maintains call detail records similar to those of a traditional cellular or wire line telephone company. Additionally, they also store the text message content of sent and received text messages, as well as any saved voice mails and the associated transcript.

63.     When a user links their Android device to their PROVIDER account, they have the option to transfer all the names, addresses, phone numbers, e-mail addresses, notes, and pictures associated with the account to the phone and vice-versa. When connected to the internet, Google Services will then sync any future changes across devices associated with the account which have opted in to this service. This information can assist with identifying previously unknown co-conspirators or witnesses.

64.     Based on my training and experience, I understand that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

65.     A user also has the option to store, upload, and share digital images, graphic files, video files, and other media files on servers maintained or owned by PROVIDER. These images may be downloaded from the Internet, sent from other users, or uploaded from the user's mobile

device.  In many cases, an Android user may configure their device to automatically upload

pictures taken with a mobile device to their PROVIDER account.  Based on my training and

experience, I know that these files may provide evidence of incriminating acts, identify co-

conspirators or witnesses, and assist investigators with determining geographic locations such as

residences, businesses, and other places relevant to the investigation.

66.     Additionally, PROVIDER provides the Android mobile operating system used on

mobile electronic devices, such as smartphones and tablets.  Mobile devices running on the

Android operating system frequently come with a suite of PROVIDER applications ("apps")—

such as Gmail, Chrome, and Google Maps—preinstalled on the device and accessible using a

PROVIDER account.  When a user purchases and activates a mobile device running the Android

operating system, one of the initial prompts during the set up phase is to associate a Gmail

account with the device.  If the consumer does not have an existing Gmail account, the operating

system prompts the user to create a new account.  Whether the Gmail account is new or existing,

the association of the account with the device allows PROVIDER to collect and store

information regarding the use of the device which can be relevant to the criminal investigation.

Some Android services may also be registered with an e-mail account not hosted by

PROVIDER.

67.     Mobile devices running on PROVIDER'S Android mobile operating system come

pre-installed with PROVIDER'S Google Play Store app, which allows the device user to

download other PROVIDER and third-party apps to the device, either free or at cost.  Google

Play Store also functions as a digital media store, allowing Android users to purchase music,

books movies, and television programs.  In my training and experience, the identification of apps

downloaded from Google Play Store may reveal services used to communicate with accomplices

28

and co-conspirators and services used in furtherance of the criminal activity.

68.     PROVIDER also offers its own web browser, a program called Google Chrome, which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Users who have a Google account can use Google Chrome on multiple devices, and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating system).  Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes, and can choose to require a passphrase to sync between different computers as well as to encrypt any passwords stored by Google Chrome.   Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

69.     PROVIDER offers a range of additional services to its users which can be accessed from an Android device via mobile apps or the Google Chrome web browser.  These include:

   a.   **Google Plus**, a social networking platform on which Google users can create a publicly visible profile that displays status updates posted by the user and certain other user-populated information, including a "tagline" describing the user, a profile photo, background photo, cover photo, and other details about the user, including the user's birthday, previous work and school history, interests, and places lived.  Google Plus users are able to communicate with, "follow" the profiles and activities of, comment on posts made by, and share information posted by, other Google Plus users.  A Google Plus user also can elect to display on his or her Google Plus profile links to (a) the user's other social networking profiles or accounts (including those that are non-PROVIDER-based), (b)

29

websites for which the user is a contributing author, and (c) links to any other websites that are recommended by the use;

b. **Google Hangouts** ("Hangouts"), an instant messaging service which allows users to communicate by text, voice, and video.  A Hangouts user can, among other things, participate in group conversations, share photos, maps, and other media with other users of Hangouts, and place calls to landline, mobile, and internet-based telephone numbers;

c. **Google Photos** ("Photos"), a digital photograph and video storage service where a user can upload photos and videos from any platform to servers controlled by PROVIDER, categorize these photos and videos into albums, and share them with other users;

d. **Google Maps**, a geolocation service through which users can find and share turn-by-turn directions between two points, save locations, and search geographic areas, including their current vicinity.  Users can share their real-time location with others through Maps by using the Location Sharing feature.  PROVIDER retains a record of the use of this service whenever the user is logged into their account and has opted into location services and history settings.  PROVIDER account holders can also create, save, and share personalized maps using Google My Maps;

e. **Google Location Services and Location History**, device settings by which users authorize PROVIDER to access and retain a record of their device's approximate location at regular intervals using GPS, WiFi, mobile networks, sensors, and other sources.  This location data is then supplied to any apps (whether PROVIDER-based or otherwise) operating on the devices that have been authorized by the user to access the user's location information;

f. **Google Docs**, **Google Sheets**, **Google Slides**, **Google Forms**, and **Google Jamboard**, services provided by PROVIDER that offer users web-based alternatives to existing word processing, spreadsheet, and presentation software. Documents created using these platforms are stored in servers controlled by PROVIDER and accessible from any device using web browsers and mobile apps

30

logged into the user's account.  The creator of the document can enable access and editing to the document by any other user to allow for collaboration and communication in the document development.  This information, based on my training and experience, can include pay-owe sheets, recordation of sales, as well as communications with unknown co-conspirators and or witnesses;

70.     PROVIDER also provides cloud storage through **Google Drive**, which includes an initial fifteen gigabytes of free storage space and the ability for users to purchase additional space if needed.  That storage space, located on servers controlled by PROVIDER, may contain data associated with the use of Drive-connected devices, including the services and applications described above.   Drive can be used to store Android device backups, which can contain a user's photos and videos, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voice-mail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Android-device users can also configure many third-party apps (such as WhatsApp, Snapchat, and Twitter) to automatically back-up the app data to Google Drive.  Data stored on Google Drive can be accessed by the user from any device using mobile apps and web browsers logged into the user's account, allowing users to easily regain information if their device is lost, stolen, or damaged.

71.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their users, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also

31

commonly have records of the Internet Protocol address ("IP address") used to register the

account and the IP addresses associated with other logins to the account.  Because every device

that connects to the Internet must use an IP address, IP address information can help to identify

which devices were used to access the relevant account.

72.     PROVIDER also collects and retains location data from Android-enabled mobile

devices that have opted into the Location Services and Location History services.  The company

uses this information for location-based services, such as targeted advertising and Google Maps

guidance.  This information derives from a range of sources, including Global Positioning

System (GPS) data, cell site/cell tower information, and Wi-Fi access points.  User preferences

may impact the extent and detail of the location information collected.  Other information may

be collected by PROVIDER that provides inferences about a user's location.  For example, WiFi

access points may have descriptive names or be associated with locations in publicly accessible

geolocation databases.  IP addresses may also be associated with locations through similar

services.  Advertising records may contain specific or inferred location information.  Metadata

associated with image and video files stored by PROVIDER on behalf of a user may include

information about where the images or videos were taken (EXIF data, for example).  In my

training and experience, this data can show the movement of the suspect's mobile device and

assist investigators with establishing patterns of movement and identifying residences, work

locations, potential drug stash houses, suppliers, customer addresses, and other areas of

investigative interest.

73.     Based on my training and experience, I understand that providers such as

PROVIDER also collect information relating to the devices used to access a user's account –

such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be

identified in various ways.  For example, some identifiers are assigned to a device by the

manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a

telephone carrier concerning a particular user account for cellular data or voice services, and

some identifiers are actually assigned by PROVIDER in order to track what devices are using

PROVIDER's accounts and services.  Examples of these identifiers include unique application

number, hardware model, operating system version, Global Unique Identifier ("GUID"), device

serial number, mobile network information, telephone number, Media Access Control ("MAC")

address, and International Mobile Equipment Identity ("IMEI").  Based on my training and

experience, I know that such identifiers may constitute evidence of the crimes under

investigation because they can be used (a) to find other PROVIDER accounts created or accessed

by the same device and likely belonging to the same user, (b) to find other types of accounts

linked to the same device and user, and (c) to determine whether a particular device recovered

during the course of the investigation was used to access the PROVIDER account.

74.     PROVIDER also allows its users to access its various services through an

application that can be installed on and accessed via cellular telephones and other mobile

devices.  This application is associated with the user's PROVIDER account.  In my training and

experience, I have learned that when the user of a mobile application installs and launches the

application on a device (such as a cellular telephone), the application directs the device in

question to obtain a Push Token, a unique identifier that allows the provider associated with the

application (such as PROVIDER) to locate the device on which the application is

installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or

Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the

application, which in turn sends the Push Token to the application's server/provider.  Thereafter,

33

whenever the provider needs to send notifications to the user's device, it sends both the Push

Token and the payload associated with the notification (*i.e.*, the substance of what needs to be

sent by the application to the device).  To ensure this process works, Push Tokens associated

with a user's account are stored on the provider's server(s).  Accordingly, the computers of

PROVIDER are likely to contain useful information that may help to identify the specific

device(s) used by a particular user to access the user's PROVIDER account via the mobile

application.

75.     Based on my training and experience, I understand that providers such as

PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages

and using its products and services.  Basically, a "cookie" is a small file containing a string of

characters that a website attempts to place onto a user's computer.  When that computer visits

again, the website will recognize the cookie and thereby identify the same user who visited

before.  This sort of technology can be used to track users across multiple websites and online

services belonging to PROVIDER.  More sophisticated cookie technology can be used to

identify users across devices and web browsers.  From training and experience, I know that

cookies and similar technology used by providers such as PROVIDER may constitute evidence

of the criminal activity under investigation.  By linking various accounts, devices, and online

activity to the same user or users, cookies and linked information can help identify who was

using a PROVIDER account and determine the scope of criminal activity.

76.     Based on my training and experience, I understand that users can communicate

directly with PROVIDER about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records

about such communications, including records of contacts between the user and the provider's

support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

77. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

78. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was

35

accessed or used.  For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[6]

79.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In

---

[6] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

80. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney **Mitra Jafary-Hariri**, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

81. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested

warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Corey Snitchler
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July ___, 2021.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE